## BLACK v. MIDDLE GEORGIA & ATLANTIC RY. CO.

It was erroneous, on the trial of an action brought by a mother against a railroad company for the homicide of her minor son, a youth of sixteen years, to direct a verdict for the defendant, when, under the evidence submitted, the following were disputable questions, viz.: whether or not the parents of the deceased consented to his employment by the company in the work in which he was engaged when killed; whether or not the deceased was familiar with the duties incident to his employment, and, if not, whether he was or was not properly instructed and warned as to the dangers attendant upon a performance thereof; whether or not he was free from negligence as to the occurrence by which his death was occasioned; and whether or not the same was caused by the negligence of the company, or its employees.

Argued April 25,—Decided May 26, 1898.

Action for damages. Before Judge Candler. Putnam superior court. August 30, 1897.

*W. F. Jenkins & Son,* for plaintiff.

*W. B. Wingfield* and *L. A. Dean,* for defendant.

LITTLE, J.   Mrs. Sarah C. Black instituted in Putnam superior court an action against the Middle Georgia and Atlantic Railway Company, to recover damages for the homicide of her minor son, James Black, which she alleged was occasioned by the negligent handling and operation of the defendant's cars. In her petition she alleged that, by the consent of her husband, her minor son, James Black, on the 19th day of February, 1896, was employed by the company, through its track-foreman, Frank Newman, to assist in loading a pole or hand car with rock and in hauling same from a field near by to what is known as "Mud Cut," situated on the line of railroad between Eatonton and Willard station.   She alleged that the boy was sixteen years of age, and that the employment or service above referred to, and in which his father permitted him to engage, was a safe one, accompanied with no unusual hazard or danger, and was such a service as a boy sixteen years of age could well and safely render.   She alleged that no other contract or agreement was made by the parents of the minor, or by either of them, with the company or its agent touching his service, and that under the agreement the company had no right to place her minor son at any other kind of labor or at any other place; that neither of the parents ever consented in any way that their minor son should work elsewhere for the company.   She alleged that, notwithstanding her son had never had any experience as a train-hand prior to the 19th day of February, 1896, and by reason of said fact and by reason further of his tender years, immature judgment and undeveloped intellect, he was less able to judge of the danger to which he was exposed by the act of the company hereafter mentioned, the company, without the knowledge or consent of the parents, did, on the 22d day of February following, through its general manager, J. W. Preston, who had authority to direct and control its employees, to control its trains and locomotives, and to manage its business generally, assign plaintiff's son to labor as a brakeman on a construction-train, consisting of a mogul engine and several box cars heavily loaded with cross-ties and bridge timber.   She

alleged, that it was only a few minutes before the injury from which her son died occurred that she or her husband knew that their son had been assigned to duty as a brakeman, and that there was no means or opportunity on their part of terminating such service before the injury occurred; that the labor thus assigned to her son was one of great peril, risk and danger, requiring skill and experience in its performance; that while the construction-train was at Willard station, it became necessary to propel the same backward along the main line for the purpose of placing it on a side-track; that while the construction-train was being thus moved backward, Preston was present and directing its movements, and her minor son was standing upon the top and within a few feet of the end of the box car nearest the approaching passenger-train; and that while the train was so moving backward towards the switch at the entrance of the side-track, it was checked with such great and unusual suddenness and violence that her son was unable to remain upon the top of the box car, but was thrown therefrom with great violence to the track ahead of the moving train, was dragged along the track by the moving car for a distance of about seventy feet, and sustained certain described injuries from which he died on the morning following.

She alleged that the conduct of the company in thus assigning her son to duty, being without the consent of his parents, or either of them, was unauthorized and illegal; that the contract for such service, if any was made between the minor and the company, was null and void and of no legal effect. She alleged that the company was guilty of gross negligence and want of care in the following particulars: (1) In assigning the minor to duty as a brakeman on the top of the car, such service being accompanied with great peril, hazard and risk; all of which was without the consent of his parents or either of them. (2) In assigning the minor to such perilous service, when he had had no experience previously, nor any training in such work, and was therefore less able to judge of the danger surrounding him and to protect himself therefrom. (3) In checking the train with such great suddenness and violence as to throw or jerk the deceased off of the top of the box car where he had

been placed by the company. (4) In placing the mogul engine under the care and management of S. W. T. Bozeman as engineer, who had had no experience in operating a mogul engine, said engine being very large, of great power, and requiring skill and experience to properly and safely operate it. (5) In not attempting to place the construction-train on the side-track at an earlier time, when it could have been done with safety and ease, instead of waiting, as was done, until the near approach of the passenger-train, which was running rapidly, thereby requiring the movement of the construction-train to be more rapid. (6) In assigning the deceased to labor as a brakeman on the top of the box car, which was a perilous service, requiring the full use of all the physical energies and mental faculties, while the deceased was in a run-down and worn-out condition, resulting from labor performed by him for the company almost the entire preceding night, without sleep, rest, or food. She alleged that it was well known to the company that the deceased was a minor, and had no experience in train service of any kind; that he was never married, and therefore left no wife or child; that he contributed materially to her support, and that she was dependent on him for a support; that her son was of sound mind, well developed, in good health, capable of doing valuable labor, and was rapidly becoming more capable of earning money; that the full value of his life was six thousand dollars; that he was without fault and did not contribute to his death, etc.

In the answer filed by it the defendant admitted that James Black, on the day named and at the place specified in the petition, received certain injuries from which he died on the following day; it admitted that its general manager, J. W. Preston, had assigned Black to labor as a brakeman on a construction or repair train; but denied that James Black was hired by it for the particular purpose specified in the petition, and alleged that, on the contrary, he was hired, with the consent of his father and with the knowledge and consent of his mother, to do general work on the track or repair gang of defendant, under which contract it was his duty to labor on or off its repair-train at any work which might have been assigned him by

defendant, or its agents or officers in charge. It alleged that his father was himself a railroad man, of long experience and familiarity with railroad work and the duties of railroad employees, and knew that the duties of an employee on the track or repair gang would frequently require such employee to be assigned to labor as brakeman on repair-trains. It alleged that it was unable to say whether or not James Black had much or little experience as a train-hand, but averred that, before he was assigned to labor as a brakeman or train-hand, he was thoroughly examined by defendant's agent as to his knowledge of and familiarity with such duties, and it was ascertained that he was informed thereon. The defendant further denied all other allegations contained in the petition tending to impute negligence to it.

The evidence introduced by the plaintiff tended to show, that on the morning of the 19th of February, 1896, Newman, who was an extra foreman on defendant's road engaged in ballasting the road at "Mud Cut," sent one of his hands to the house of William V. Black, father of the deceased, to employ James Black to help him in loading and carrying rocks on a pole or hand car from a field near by to the cut. The father never made any contract with any one, nor did he or his wife consent to the working of their son as a brakeman on a construction or freight train. The deceased was sixteen years old, his appearance was that of a boy, and not that of a man, and any one could readily tell that he was a boy of that age by looking at him. Labor as a brakeman on a construction-train is as dangerous a place as there is on a train. It would be a great deal more dangerous than work on a pole-car. The parents did not know that their son had gone to work at any other place than that to which they had consented he could go, until they saw him pass their home on top of a box car, situated in the moving train, on February 22d, the day the injury occurred; and they then had no opportunity of preventing him from further performing such service. The deceased had never had any experience as a train-hand, and his parents, in response to a request from him to allow him to work on a train, had declined to grant him permission to do so. He had been render-

ing valuable service to his mother and other members of the family, amounting to the value of ten or fifteen dollars per month, and his mother was dependent on him for a support. It was also shown by witnesses for the plaintiff, who saw the accident at Willard station, that the train was backing at the rate of six or eight miles an hour; that the deceased was on top of the rear box car; that in undertaking to stop the train, the engine was reversed; the coupling-links began to jerk and make an unusual noise; the stopping of the train was a pretty sudden jerk, violent, and more sudden and a great deal quicker than usual. Another witness testified that he had seen many cars stop, and that this was the hardest and most violent jerk of any he had ever seen; that the deceased was standing within five or six feet of the end of the car, and he saw him do nothing to cause the fall, and that his fall was caused by the jerk. It was further shown that the deceased was giving signals properly when he was thrown off, and that this was the proper thing for a brakeman to do in the line of his duty

For the defendant, Frank Newman testified that, as track-foreman, his duties were to do anything required of him by the railroad officials from one end of the road to the other; that he went with the construction-train, distributing material and supplies for the road, such as cross-ties, loading and unloading wood, filling up bad places, etc.; that the employees hired by him were not hired for any particular job, but were hired to do anything there was to do, and to go with him on the train when necessary; that on the 19th of February he was hauling rock to ballast the track at " Mud Cut," using a hand-car for this purpose; that that was the work he wanted the deceased to do — that is, pick up the rocks from the field and put them on the hand-car; that the hand-car was pushed along the track by hand, moving about ten miles an hour downgrade, and was a safe business, unless the car was wrecked, but if wrecked, would not hurt a man pushing it. Witness had orders to take the construction or freight train out on the road to distribute ties; and it was shown by J. W. Preston, general manager of the road, that on the day of the accident the deceased came to him and requested permission to go on

top of the box cars as a brakeman. Preston asked him what he knew about it; to which the latter replied, "All about it." He then asked him if he had experience, to which he replied "Yes." He was then examined as to the meaning of one, two, and three blasts of the whistle, respectively, and upon answering these questions satisfactorily, Preston stated to the deceased that he could go up, but enjoined him to be careful. It was shown that the train, on the occasion of the injury, was backing slowly, about as fast as a man could walk; that the deceased was transmitting the signals from Preston, who was in charge of the train, to the engineer; that there was a brake on the end of the car upon which the deceased stood; that the jerk was not unusual; that the deceased seemed to be familiar with the signals, and witness did not think it necessary to ask him what he knew about the danger of braking on a car, because he gave the witness the impression that he had had experience in that line and knew all about it. Preston further testified, that he had a conversation with the father of the deceased after the accident, either on the day of the accident or the next, in which the father said he was sorry his boy had gone to work for the road, but that the deceased was very anxious to go and he and his mother consented for him to go. From this conversation the witness gathered the impression that the father had allowed the deceased to go, but against his judgment. There was also evidence tending to show that the engineer in charge of the engine was a fit and proper person to handle and operate it, and that the stop was made, not by reversing the engine, but by applying vacuum brakes. It was also in evidence that one standing as near the end of the car as was the deceased ought either to have held on to the brake or been walking against the motion of the car, it being improbable that even an experienced brakeman could have withstood the jerk attendant upon the stop, which was a usual one considering the length of the train, without resorting to the one or the other of these methods. It was also in evidence that the deceased was well developed for his age, and would have been taken by witness, from his size, to have been twenty-one or twenty-two years old. At the conclusion of the evidence, the material portions of

which are set out above, the court directed a verdict for the defendant, and the plaintiff excepted.

Inasmuch as, under the view we take of the case, a new trial must be had, and in consideration of the fact that at such hearing the pleadings will be subject to amendment and the introduction of other testimony not appearing in this record, and consequently that the present aspect of the case may be materially changed, we deem it unprofitable at this time to formulate and announce at length the principles and rules of law which control the various issues and questions raised and made in the case. In this action the plaintiff, who is the mother of the deceased, bases her right to recover against the defendant, for the homicide of her son, on the provisions of section 3828 of the Civil Code, which declares : " A mother, or if no mother, a father, may recover for the homicide of a child minor or sui juris, upon whom she or he is dependent, or who contributes to his or her support, unless said child leave a wife, husband, or child. Said mother or father shall be entitled to recover the full value of the life of said child." It is obvious, from the statement of the pleadings and evidence set out above, that it was a disputed question of fact whether or not the parents of the deceased minor consented to the employment by the company for the particular work the minor was engaged in doing when injured. It was also a disputed question of fact whether or not the deceased was familiar with the duties incident to his employment, and whether he had sufficient discretion and experience to enable him to understand and appreciate the dangers attendant upon a performance of those duties; and, if not, whether he was or was not properly instructed and warned concerning such dangers. It was also a disputed question of fact as to whether or not the deceased was free from negligence as to the occurrence by which his death was occasioned, and also whether or not the same was caused by the negligence of the company, or its employees. Upon each of these material issues of fact the evidence was more or less conflicting. Section 5331 of the Civil Code provides that: "Where there is no conflict in the evidence, and that introduced with all reasonable deductions or inferences therefrom demands a particular

verdict, the court may direct the jury to find for the party entitled thereto." Applying this rule of the code, the action of the court directing a verdict for the defendant was erroneous. The cause should have been submitted to a jury to determine the various issues of fact involved, under appropriate instructions from the court touching the rules of law applicable.

*Judgment reversed. All the Justices concurring.*